RINGEL-WOODY BOX CO., INC., v. LIUZZA ET AL.

(March 4, 1929.   Opinion and Decree.)
(April 15, 1929.   Rehearing Refused.)
(May 21, 1929.   Writ of Certiorari and Review Refused by Supreme Court.)

Chas. Rosen, of New Orleans, attorney for plaintiff, appellant.

P. M. Milner, of New Orleans, attorney for defendants, appellees.

JANVIER, J.  Liuzza was the owner of certain property on Tulane Avenue, in New Orleans.  On it there was a partially constructed building.  Plaintiffs were engaged in the manufacture of paste-board boxes and agreed to purchase the property mentioned for $25,000.00, provided Liuzza would complete the construction of the building.  He agreed to this.  It was understood that the first floor of the building was to be constructed of brick and the second floor of wood, weather-boarded on the outside.  Subsequently to the original agreement—possibly at the suggestion of Liuzza, but more probably at the request of plaintiffs—it was decided to use hollow tile construction on the second floor instead of wood.  The building was thus completed by defendant, Liuzza, and, as plaintiffs were anxious to get into it as soon as possible, an agreement was entered into under which they were to take possession of the property prior to the execution of the act of sale.  During the few weeks

in which they occupied the property, prior to the passage of the act of sale, a number of heavy rains occurred and, on each such occasion, a great deal of water got into the second floor of the building. For this reason, when the time arrived for the passage of the act of sale, the purchasers refused to take title unless the seller, Liuzza, would furnish them a bond for $3,000.00, guaranteeing the following:

"The surety bond herein given of $3,-000.00 is also given to insure and hold free and harmless from expense to purchaser, with reference to the following: It is admitted by the parties hereto for the purpose of this transaction that the building or improvements· which have been erected on the property by the vendor herein and which were on the property as is herein described and as is herewith being transferred to purchaser is defective in the sense that either the roof of the building contains a number of leaks which causes water to enter the building profusely during heavy rains. Vendor recognizes this defect in the property which he is herewith delivering to purchaser. Vendor also recognizes his liability to completely repair said defects to the satisfaction of purchaser. Vendor herein binds and obligates himself to repair these defects so as to effectually stop any and all such leaks at once, said work to commence within five days of the date of the passing of this act and to be completed within the thirty days of the passing of this act. In the event vendor does not so commence and complete the repair of said defects herein mentioned and referred to within the time herein specified, purchaser shall have the right to do so at the expense of vendor, these repairs to be at the expense of vendor and in the event purchaser is required to make these repairs in lieu of vendor and in accordance with the agreements herein made, then and in that event the bond of $3,000.00 which is herein given by vendor to purchaser is to protect and hold purchaser free and harmless from any and all expenses, damages, etc., in connection therewith."

It appears that Liuzza then sent a contractor to the plaintiffs with instructions to obtain from them a list of things that they required done. This contractor, according to defendants' contention, did everything that was required, but, according to plaintiffs, the water continued to come into the building in large quantities. Thereupon plaintiffs themselves undertook to correct the defects, and for this purpose expended the sum herein sued for. This amount was paid to the contractor employed by the plaintiffs for the stuccoing of the entire outside of the second story of the building.

This suit is brought against John Liuzza, the vendor of the property, and against the American Surety Company of New York, the surety on the bond above referred to. The defense is that the trouble of which plaintiffs complained resulted from the nature of the construction of the building, and not from construction defects; in other words, that a hollow tile building of the character stipulated for by the plaintiffs could not be made waterproof and that, therefore, plaintiffs, as a matter of fact, had obtained exactly what they contracted for. Defendants contend that the water which got into the building did not leak in through holes, but seeped in as a result of the porousness of the hollow tiles.

The question which we are called upon to determine is whether or not plaintiff's troubles resulted from defective construction and defective repairing of the building, or from the inherent inability of unprotected tile to keep out water. At the outset, we notice that in spite of the claim in the petition "that the building and roof leaked profusely during heavy rains," Mr. Ringel, principal witness for the plaintiff, admitted that there were no leaks in the roof: " * * * it developed it was the side wall and not the roof."

We are of the opinion that it was plaintiff themselves who initiated the change in the upper floor of the building from wood to hollow tile, or, at any rate, that they readily accepted the suggestion if, in fact, they did not initiate it. That they readily accepted it, and that they themselves selected the method of construction, is testified to by Mr. Swiler, the contractor, who, in referring to his conversation with the plaintiffs and the defendant, Liuzza, on this point said:

"They said they wanted a cheap building * * *. First, I had a contract with them to erect a first story brick wall on the outside, backed up with tile. Then a discussion came up; they asked me about a tile wall and I said I thought it would be more economical to put the tile wall, but it would not be a frame wall. They got me to give them a figure on the tile wall, and I brought them a bid down there * * *. They accepted my estimate to take and construct that tile wall—because I had went to their office three or four times to see if their man came in from New York, their president,—and I just put in lime cement mortar, what we call bastard mortar, used in all construction work —one barrel of lime, four barrels sand and a barrel of cement; that is the mortar we use on all buildings."

If, then, plaintiffs themselves either selected or approved the material and method of construction, they cannot complain if the trouble results from the kind of material or from the method of construction. It appears to us from a careful reading of the testimony that, after the repair work was done by Liuzza, the real trouble resulted entirely from the inherent inability of unprotected hollow tile to prevent seepage of water. Our opinion in this regard is based largely on the testimony of plaintiff's contractor, Mr. Woodward, a man of large experience in building in this city, who testified as follows:

"It has been my experience that no tile wall, unless it is an inter-locking tile wall, is impervious to water."

It was suggested that possibly the joints between the tiles had not been properly cemented or pointed, but Mr. Woodward negatived the idea that this trouble might result from improper cementing or pointing, and said:

"Q. Now, getting rid of the absorption problem—which seems to be ridiculous, to me,—the answer to Mr. Ringel's complaint must have been that a certain number of joints on the outside of this wall had opened, and the water beating up against the perpendicular wall went into the joints and seeped through into the interior of the building?

"A. That is my opinion, yes, sir.

"Q. Now, your experience has been that that is common, in this character of construction?

"A. Yes, sir.

"Q. As a matter of fact, it could be corrected by going over these joints and pointing them up, wherever it was apparent that the joints had opened?

"A. To repeat my opinion, to the effect that in a wall other than an interlocking tile wall, pointing would not be a remedy.

"Q. Not even if pointed with a waterproof mixture of mortar?

"A. No,—I wouldn't guarantee it."

It is true that certain minor cracks were pointed out to Mr. Woodward, and he was asked if these cracks could have allowed the water to seep through. His testimony on this point follows:

"Q. In those places would it be possible for rain to beat through?

"A. I hardly think.

"Q. Not even where you could see the daylight?

"A. I hardly think so."

The question of whether or not the method of construction selected in this case was usual, or could be relied on to give satisfaction, was discussed by Mr. Wood-

ward, having been raised by the trial judge. The testimony is interesting and we quote from it at length:

"Q. Are any buildings, constructed with hollow tile, simply constructed with the hollow tile without stucco or waterproof paint or cement?
"A. Very rarely.
"Q. Are there some buildings of that construction in this city?
"A. You probably have seen some with hollow tile block appearance from the exterior, but with the interlocking device on the interior. I built some myself on those lines, one at Thalia and the river front, for the Fruit Dispatch.
"Q. So that any tile constructed building that is not of interlocking tiles needs waterproof paint or cement or something else?
"A. That is my opinion,—regardless of whether the joints are struck or not."

Mr. Woodward's opinion as to the unsatisfactory results usually following the use of unprotected or uncovered hollow tile is fully concurred in by Mr. De Buys, an architect of large experience.

We are therefore quite well convinced that the real trouble here was not that the defendant, Liuzza, did not comply with his contract as far as it was possible to do so, but that it was to all intents impossible to obtain, by the use of the material and the method of construction selected, what plaintiffs wanted, that is, an absolutely dry, water-proof building.

The only question left for determination, then, is whether or not defendants are bound to comply with the stipulation in the contract and in the bond, "To completely repair said defects to the satisfaction of purchaser." We realize that the duty of an obligor, under such a contract as this, "to give satisfaction," does not terminate merely because it is difficult for him to comply, but we do not believe that the contract itself intended that the obligor should eliminate seepage. Immediately following the stipulation to which we have referred appears what seems to be an explanation or limitation of that stipulation, in these words:

"Vendor herein binds and obligates himself to repair these defects so as to effectually stop any and all leaks at once."

It seems, then, that it was only the leaks which the obligor had in mind and not the seepage, and in view of the fact that it was not only impracticable, but, to all intent, impossible, to prevent seepage in a building of that character, we cannot hold that the obligation of Liuzza was to do an impossible thing, particularly when that thing was not contemplated by the contract.

For these reasons the judgment appealed from is affirmed, at the cost of appellant.